IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | Criminal Action No. 7:23-cr-00001 |
| v.   ) | |
| ) | By: Elizabeth K. Dillon |
| ROBERT JUNIOR OVERSTREET, II   ) | United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Defendant Robert Junior Overstreet, II has filed a motion in limine (Dkt. No. 28), which is fully briefed and which the parties argued at the pretrial conference held on October 30, 2023. Overstreet's motion asks the court to admit statements of an unavailable declarant, Kanye Carter.[1] The court took the motion under advisement at the conference. For the reasons set forth below, the motion will be denied.

I.  BACKGROUND

Overstreet's criminal trial is set to begin on Tuesday, November 6, 2023. He is charged in a single-count indictment with possessing a firearm while a felon, in violation of 18 U.S.C. § 922(g). The underlying facts, according to the government, are that Roanoke Police Detective Bridges drove by 1230 Hanover Avenue, NW, on December 14, 2022, and initially observed Overstreet outside of that residence. He later observed Overstreet holding a black object that looked like a firearm, and walking back and forth between the vehicle Overstreet had arrived in (a Ford Expedition), another car, and the home where Carter lived, which was owned by Carter's grandmother. Bridges later saw Overstreet enter the back passenger side of the Expedition, saw Overstreet's arm reach out the window, and saw Overstreet shoot the firearm. Bridges followed the car, and it was pulled over.

---
[1] Carter is now deceased and thus unavailable.

When the car was pulled over, the driver, Ms. Quaneisha Fuhrman, told police that she owned the firearm, which was found between her legs in the driver's seat. A gunshot residue test performed on Overstreet at that time came back positive. Fuhrman later recanted, claiming that the gun was Overstreet's, that he shot it, and that he asked her to claim it was hers.

Carter's statements were made to Gabriel Mata, an investigator with the Office of the Federal Public Defender, when Mata interviewed Carter about five months after the incident. According to Mata, Carter told him that he had interacted with both Fuhrman and Overstreet shortly before the events leading to the indictment and that: (1) he saw Fuhrman with a gun in her waistband, not a holster; (2) he did not observe Overstreet with a gun that day; and (3) he observed Fuhrman shooting the gun before driving off.

At the pretrial conference, the court heard testimony from Mata regarding his conversation with Carter. Mata explained that Carter's name as a potential witness had been provided by Overstreet. Mata attempted to contact Carter to speak with him, they texted back and forth about Carter's schedule, and they were eventually able to speak via telephone on May 28, 2023. Carter knew that he was speaking with an investigator for Overstreet's attorney.

Carter told Mata that he and Overstreet were cousins and really close.[2] On the date of the offense,[3] Carter was at that house when Overstreet arrived with two women. The three visitors and Carter went to a store and then returned to the residence. Thereafter, Overstreet and the two females spent time hanging outside of the front yard and drinking, while Carter was back and forth between the house and the porch.

---

[2] As the government pointed out, Carter and Overstreet also had been roommates at Carter's grandmother's house.

[3] There was a discrepancy in the date noted in Mata's report, but Mata testified that he and Carter were talking about the date of the offense, and the date was Mata's error.

Carter told Overstreet that Fuhrman had a gun, and Mata asked Carter to tell him more about that. Carter said he had seen the gun on her waist, but not in a holster, when she entered the residence to use the restroom, and again when she left after using the restroom. When Mata asked Carter if he had seen Overstreet with a gun, he said no. At some point, Carter also observed Fuhrman without the gun. Upon questioning (the specifics of which are discussed in context below), Carter also told Mata that he saw Fuhrman shoot the gun when she was "half in and half out" of the vehicle. Fuhrman then drove away, apparently with Overstreet in the vehicle.

## II.  DISCUSSION

The rule under which defendant seeks admission of Carter's statement, Federal Rule of Evidence 807(a)—also known as the "residual hearsay" exception—provides:

> Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
>   (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
>   (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(c).

The Fourth Circuit has explained that Rule 807 is a "narrow exception" to the rule against hearsay. *United States v. Cunningham*, 761 F. App'x 203, 206 (4th Cir. 2019) (quoting *United States v. Dunford*, 148 F.3d 385, 392 (4th Cir. 1998). "The most important" requirement for the exception is that the statement have guarantees of trustworthiness. *Dunford*, 148 F.3d at 393.

In determining whether a statement is trustworthy, Overstreet urges the court to consider "any corroborating facts as well as the circumstances in which the declarant made the statement." (Mot. in Limine 3.)  The only binding authority he cites for this proposition is *United States v. Clarke*, 2 F.3d 81 (4th Cir. 1993).  But *Clarke* nowhere states that other evidence corroborating the substance of the statement should be considered.  Instead, both in its description of what should be considered and in what the court there actually considered, the court clearly is considering the "totality of the circumstances that surround the making of the statement."  *Id.* at 84.

For its part, the United States points to a statement by the Fourth Circuit that "[t]rustworthiness must emanate from the circumstances of a hearsay statement, not from its consistency with other evidence offered in the case." *Shaw v. United States*, 69 F.3d 1249, 1253 n.5 (4th Cir. 1995) (citation omitted).  In *Shaw*, the Fourth Circuit found that the court had "erred to the extent that it looked beyond the immediate circumstances of the deceased witnesses' statements to other corroborating evidence in the record." *Id.*

The defendant correctly points out, though, that the rule itself direct courts to consider "the evidence, if any, corroborating the statement."  Fed. R. Evid. 807.  And the committee notes to the 2019 amendment to the rule explain that the amendment "specifically requires the court to consider corroborating evidence in the trustworthiness inquiry" to provide a uniform approach, as courts previously disagreed about this issue.  Fed. R. Evid. 807.

The court thus considers both the circumstances of the statement and any corroborating evidence in determining trustworthiness.  Overstreet points to the corroborating evidence that the gun was found between Fuhrman's knees in the car and that she initially claimed it as hers, as well as to evidence supporting that Carter was present.  Those facts—in general terms—would

corroborate that Fuhrman possessed the gun at some point during the day and when the car was pulled over.

Notably, though, the critical fact that Carter's testimony would provide is that Fuhrman had *shot* the gun. The mere fact that Fuhrman at some point had the gun, or that Overstreet at some point did not have a gun, would not exonerate Overstreet of the offense if he had shot the gun. Thus, although there is some corroborating evidence, it does not strongly favor Overstreet.

Moreover, looking at the circumstances of the statement here, the court concludes that there are insufficient guarantees of trustworthiness to allow it under Rule 807. First of all, there is a close relationship between Overstreet and Carter, such that the likelihood of bias is greater. Put differently, Carter is not a disinterested witness.[4] Additionally, while the interview understandably did not involve questioning akin to cross-examination, Mata's questioning of Carter did not test his memory, ask whether he was drinking alcohol on the day in question (as Overstreet and others were), or ask questions about other verifiable information.

Further, Carter was not under oath, and he was not speaking to law enforcement, but to a member of his cousin's defense team. The defense states that Carter had "no reason to lie" and that he would have felt no pressure to speak to Mata. Perhaps. But the converse is also true—Carter would have had no fear of perjury, and no real incentive to refrain from lying. Put differently, if he did not tell the truth, there would be no consequences.

Perhaps most importantly, the way in which Carter's statements trickled out in response to Mata's questions cause the court to doubt their trustworthiness. Tellingly, when Mata asked if

---

[4] Although the court does not afford this evidence significant weight, it notes that in an ambiguous text he sent to another person, Derrick, Carter said "[I] gotta . . . talk to my cousin Lawyer . . . he put me as a witness so I gotta tell the Detective and lawyer the story that happen[.]" There also are recorded jail calls from Overstreet in which he is trying to ensure that Fuhrman maintained that she had shot the gun, not him. Lastly, Carter sent numerous texts passing on directions from Overstreet to the individuals Carter was texting, while Overstreet was in jail. These facts, too, show the close relationship and could support a finding that Overstreet was trying to influence testimony. Even without these records, though, the court does not find the statements sufficiently trustworthy.

Carter had personally observed Fuhrman shoot the gun, he said, "Quaneisha did it." Then, Mata questioned again whether Carter had observed her shooting the weapon, and Carter said, "Yeah, I heard it." It was only upon a subsequent question, in which Mata asked whether he had personally seen Fuhrman shoot the gun, that Carter responded, "Yeah." The way in which that information was conveyed does not give the court assurances of its trustworthiness.

In sum, the court finds that Carter's statements lack sufficient guarantees of trustworthiness to allow it to be admitted under Rule 807.

### III.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that defendant's motion in limine (Dkt. No. 28) is DENIED. The court will exclude testimony of Carter's hearsay statements to Mr. Mata.

Entered: November 1, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge